# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-00195-CDS-BNW |
| Plaintiff, | |
| v. | **ORDER AND REPORT AND RECOMMENDATION** |
| LEONARD JAMES SHOVE, | |
| Defendant. | |

Before the Court is Leonard Shove's Motion to Suppress, which seeks exclusion of evidence found on his cell phone during a search by his probation officer (as well as a later search by the FBI under a resulting search warrant). ECF No. 20. Though privacy interests in a cell phone are weighty given the nature of its contents, Shove's privacy interests are diminished by his status as a supervisee, the serious nature of his offense, and the clarity of his search condition when read in conjunction with other conditions of his supervised release. And Shove's missed polygraph test, his admission to lying about the reason for missing the test, and his admission to possessing an undisclosed device with child sexual abuse material—all of which occurred prior to the cell phone search—gave officers specific reasons to suspect that Shove violated his conditions. Thus, the Government's interests in combating recidivism and facilitating reintegration were heightened.

In balancing the interests against each other, the Government's heightened interests outweigh Shove's diminished privacy interests. As such, the cell phone search was reasonable under the Fourth Amendment. The Court therefore recommends denying Shove's Motion.

## I. BACKGROUND

In October 2023, Shove was indicted for receipt and possession of child sexual abuse material.[1] *See generally* ECF No. 1. The indictment stemmed from Shove's alleged violation of his conditions of supervised release, as he is subject to lifetime supervision from two prior related convictions. *See id.* Shove filed his Motion to Suppress in May 2024, arguing that the search condition of his supervised release did not encompass a search of his cell phone (in which the CSAM was found). ECF No. 20. The Government responded, ECF No. 31, and Shove replied. ECF No. 38.

The Court held an evidentiary hearing on September 26, 2024. ECF No. 56. Weeks later, the Court heard final arguments from counsel. ECF No. 60. The case is currently set to proceed to trial on December 16, 2024. ECF No. 44.

## II. EVIDENTIARY HEARING TESTIMONY

At the evidentiary hearing, each party presented evidence and called witnesses to testify. *See* ECF No. 56. The Court summarizes the pertinent evidence and, where relevant, makes factual findings, credibility findings, and rulings on outstanding objections below.

### A. Shove's Criminal History

In 2002, Shove was convicted of possession and receipt of CSAM. ECF No. 59 at 14:2–4. The offense's underlying conduct included attempts to communicate with minors for sexual purposes. *Id.* at 15:11–15. Shove served time and was placed on supervised release. *Id.* at 16:11–13. While on supervision, he was again found to be in possession of CSAM. *Id.* at 16:15–25. As a result, his supervised release was revoked, and a new case was filed against him. *Id.* at 16:23–17:4; Gov't Ex. 3[2].

Shove served around 150 months on his new case and was placed on lifetime supervision. ECF No. 59 at 17:11–16. His supervision was revoked in 2018 after he was found in possession

---

[1] Although the term "child pornography" is currently used in federal statutes, several organizations recommend use of the term "child sexual abuse material" or "CSAM" instead. U.S. DEP'T OF JUST., CHILD SEXUAL ABUSE MATERIAL (2023), https://www.justice.gov/d9/2023-06/child_sexual_abuse_material_2.pdf (last visited Nov. 4, 2024).

[2] Exhibit citations refer to the parties' evidentiary hearing exhibits.

of an unauthorized phone, which contained CSAM and messages revealing that Shove attempted to meet a minor for purposes of sexual contact. *Id.* at 19:12–20:5. He served time for that violation and was placed back on lifetime supervision upon release. *Id.* at 20:11–15; Gov't Ex. 5; Def. Ex. B. His supervision began once again on April 13, 2020. Gov't Ex. 8 at 1.

As relevant to this Motion, Shove's conditions include:

**SPECIAL CONDITIONS OF SUPERVISION**

1. **Minor Prohibition** – You must not have direct contact with any child you know or reasonably should know to be under the age of 18, including your own children, without the permission of the probation officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18, including your own children, without the permission of the probation officer, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

2. **Search and Seizure** - You shall submit to the search of your person, property, residence, or automobile under your control by the probation officer or any other authorized person under the immediate and personal supervision of the probation officer, without a search warrant to ensure compliance with all conditions of release.

3. **No Pornography** – You must not view or possess any "visual depiction" (as defined in 18 U.S.C. § 2256), including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of "sexually explicit conduct" (as defined in 18 U.S.C. § 2256).

4. **Sex Offender Treatment** – You must participate in a sex offense-specific treatment program, and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

5. **Polygraph Testing** – You must submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that you are in compliance with the requirements of your supervision or treatment program.

6. **Computer Search – Monitoring Software** – To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct periodic, unannounced searches of any computers (as defined in 18 U.S.C. § 1030 (e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation. You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

Gov't Ex. 5 at 5; Def. Ex. B at 5. He also signed a Computer Monitoring Agreement informing him that any information gathered by monitoring software installed on his devices could be used against him. Gov't Ex. 6.

**B. Pre-Search Investigation**

U.S. Probation Officer Bryce Stark began supervising Shove in 2020 or 2021. ECF No. 59 at 70:12–18. In June 2023, P.O. Stark searched a cell phone that Shove was not authorized to have and found CSAM along with adult pornography. *Id.* at 11:15–12:2. Stark filed a petition seeking to revoke Shove's supervised release based on his findings. *Id.* at 11:15–17.

Several factors contributed to P.O. Stark's decision to invoke Shove's search condition and search his undisclosed phone.[3] *Id.* at 12:14–13:17. To begin, Shove's criminal history (as described above) concerned him, as did the nature of his convictions. *Id.* at 13:15–14:1.

Issues also arose throughout Shove's supervision. *Id.* at 25:5–8. For example, in October 2020, monitoring software detected that Shove accessed adult pornography on his cell phone. *Id.* at 30:4–31:14. Around the same time, Shove installed an antivirus program on his phone that impeded the monitoring system from capturing screenshots. *Id.* at 31:1–3. In September 2021, P.O. Stark discovered that Shove ordered sex toys—in violation of his sex offender treatment rules—while consensually reviewing his phone. *Id.* at 26:1–4. In June 2022, P.O. Stark learned that Shove installed an app on his phone that allowed him to view pornography without being detected by the computer monitoring software. *Id.* at 26:20–28:21. When the U.S. Probation Office later switched monitoring companies in March 2023, Shove failed to install the new system despite being instructed to do so. *Id.* at 32:4–33:6. A month later, P.O. Stark searched Shove's phone and noticed that he had deleted certain messages. *Id.* at 34:9–35:13. And at other times when P.O. Stark visited Shove's apartment (which was small), it would take Shove two to five minutes to answer the door. *Id.* at 38:10–25. Based on the lag time, P.O. Stark was concerned that Shove may have been hiding items that would otherwise be in plain view. *Id.* at 39:3–5.

On May 23, 2023, Shove called P.O. Stark and told him that he could not attend his polygraph examination that day because he had diarrhea. *Id.* at 35:19–22. When P.O. Stark went to Shove's apartment to question him about his absence, Shove admitted that he was afraid to take the test. *Id.* at 36:1–11. He explained that during previous polygraph tests, examiners told him

---

[3] The Court finds P.O. Stark's testimony regarding the need to search Shove's phone credible. The Court is cognizant of the fact that (1) P.O. Stark did not file a petition seeking to revoke Shove's supervision until June 2023, (2) P.O. Gabonia's report suggests that the search condition was solely being invoked due to Shove's failed polygraph exam, and (3) the search plan cites the polygraph results as reasonable suspicion for the search. ECF No. 59 at 72:9–19, 83:3–7, 93:2–19; Def. Ex. E at 2. But these three considerations do not preclude a finding that P.O. Stark considered other factors as well when deciding to invoke the search condition and search Shove's phone. Moreover, even though the underlying conduct of his criminal history is dated, there were several other actions Shove took closer in time to the search that justified P.O. Stark's concerns.

1  that he did not do well, or that he failed portions related to contact with minors. *Id.* at 36:15–18.

2  Concerned that Shove was trying to conceal something, P.O. Stark asked whether Shove had any

3  undisclosed devices, which Shove denied. *Id.* at 37:4–38:1.

4      P.O. Stark scheduled a make-up test for the following day, and Rick Jordan conducted the

5  polygraph exam. *Id.* at 38:2–6, 39:11–12. Upon receiving the results, P.O. Stark was concerned

6  because Shove had a "significant reaction" when asked if he used or possessed an electronic

7  device that was not known to U.S. Probation.[4] *Id.* at 46:1–5. Based on Shove's significant

8  reaction—in conjunction with his criminal history, past violations, and other issues on

9  supervision—P.O. Stark discussed and received authorization from his supervisor, Joy Gabonia,

10  to conduct a search. *Id.* at 50:1–51:11.

11      On June 9, 2023, P.O. Gabonia prepared a search plan. *Id.* at 72:24–73:17; Def. Ex. E.

12  The plan indicated that Shove's search condition authorized the search and listed "person" and

13  "apartment" as objects to be searched. ECF No. 59 at 74:14–75:9; Def. Ex. E at 2. It also included

14  Shove's failed polygraph exam under a section titled "Reasonable Suspicion." ECF No. 59 at

15  95:2–19; Def. Ex. E at 2.

---

[4] At the evidentiary hearing, Shove objected to P.O. Stark's discussion of the polygraph results on due process confrontation grounds. ECF No. 59 at 41:1–7. He argued that under *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999), testimony about the polygraph results needed to come from the examiner himself because their reliability is questionable. *Id.* at 42:14–43:6. The Court deferred ruling on the objection until this Recommendation. *Id.* at 45:16–22.

The Court overrules the objection. Setting aside the evidentiary differences between a revocation hearing (the type of hearing at issue in *Comito*) and a suppression hearing, the weight of a due process confrontation right depends on the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the evidence. *Comito*, 177 F.3d at 1170. Here, P.O. Stark only discussed the results in the context of what he knew prior to submitting his search plan and what he believed the results to mean. The results—when discussed by P.O. Stark—were also not admitted to show that Shove did in fact lie or violate his conditions. And Shove *did* have an opportunity to confront Rick Jordan, the polygraph examiner. Thus, even if *Comito* applies to suppression hearings (which the Court does not decide), Shove did not establish that the strength of his confrontation interest requires exclusion of P.O. Stark's testimony about the results, especially given his opportunity to confront the testimony in question. *See id.* at 1171–73.

Days later, on June 12, 2023, P.O. Stark initiated the search plan. ECF No. 59 at 51:12–15. He originally intended to search Shove's apartment, but when he called Shove, he explained (and P.O. Stark later confirmed) that he had been evicted. *Id.* at 51:16–52:15. P.O. Stark told Shove to go forward with the counseling session scheduled for that day at Evergreen Counseling. *Id.* at 52:4–10. P.O. Stark and his supervisor then decided to meet Shove at Evergreen. *Id.* at 52:17–20.

Soon after, P.O. Stark arrived with fellow probation officers Joy Gabonia, Tawnee Salem, and Landon VanWormer. *Id.* at 53:13–25. When P.O. Stark entered the lobby, he saw a backpack with a hardhat attached to it on an empty chair. *Id.* at 55:18–23. He knew that Shove worked in construction and observed that no one else was in the lobby. *Id.* at 55:24–56:2. Officers Stark and Gabonia then joined Shove in his therapist's office while Vanwormer remained near the backpack. *Id.* at 55:3–8, 110:21–25. In the office, P.O. Stark saw a cell phone on the chair next to Shove. *Id.* at 56:11–14. He then informed Shove that he was invoking the search condition of his supervised release. *Id.* at 56:11–18, 81:13–18.

Once P.O. Stark started questioning Shove, he admitted that the backpack in the lobby was his and that he had an undisclosed phone inside. *Id.* at 57:4–12, 111:24–112:4. P.O. Stark asked whether there was anything on his second phone that needed to be disclosed, to which Shove responded, "You might as well take me to jail. There's child pornography on it." *Id.* at 57:17–23. During this interaction, P.O. VanWormer was in the lobby—six to eight feet away from the therapist's office—but he could see both Shove and Stark as well as hear their conversation. *Id.* at 96:6–18, 111:16–112. Because the therapist's door remained open, P.O. Stark too could see P.O. VanWormer. *Id.* at 58:7–22, 84:21–85:16, 87:14–18, 96:6–19. After Shove's admissions, P.O. VanWormer began taking pictures of the backpack and started searching it. *Id.* at 58:20–59:6, 113:5–9.

Shove told the officers that the phone was in the front pouch of his backpack. *Id.* at 112:15–19. While P.O. VanWormer retrieved his phone, P.O. Stark asked Shove if he had had contact with any minors. *Id.* at 59:7–13. Shove admitted that he had sexual contact with a 14- or

15-year-old boy. *Id.* at 59:14–18. P.O. Stark then asked Shove for his passwords, which were later used to access his devices, and Shove obliged. *Id.* at 59:21–60:7.

The way the summary portion of P.O. Stark's Petition is written suggests that Shove admitted to having an undisclosed device, the officers searched his phone, and Shove *then* admitted that the phone contained CSAM and that he had sexual contact with a minor. Def. Ex. C at 5. The same goes for P.O. Gabonia's Report.[5] ECF No. 59 at 92:9–93:6. But the first paragraph on the second page of the Petition is consistent with P.O. Stark's testimony that Shove admitted that the phone contained CSAM *before* the phone was searched. *Id.* at 2. P.O. Stark also wrote an email to the FBI a week after the search took place that sets forth the same timeline in which the admissions take place prior to the search. Gov't Ex. 12 at 1. And P.O. VanWormer testified that he heard Shove admit to his undisclosed phone containing CSAM before he took photos of the backpack and initiated the search. ECF No. 59 at 113:5–9. Given these corroborating materials and lack of contradictory evidence, the Court credits the officers' testimony regarding the timeline.

**C. Cell Phone Search**

P.O. VanWormer was the first person to look at Shove's phone. ECF No. 59 at 88:24–89:4. Upon finding the cell phone, he pushed the side button to illuminate the lock screen, revealing an image of what appeared to be a minor boy with an erect penis and his anus showing. *Id.* at 113:11–16. P.O. VanWormer then advised P.O. Stark that the lock screen contained CSAM. *Id.* at 62:17–22.

At that point, the officers moved Shove to another office. *Id.* at 60:12–19. P.O. Stark saw the lock screen, which he described as a 13- to 14-year-old boy, completely nude, with an erect penis. *Id.* at 64:8–10. He then asked Shove for his passcode and accessed the phone. *Id.* at 63:17–19. Once unlocked, P.O. Stark discovered that the home screen contained an image of a minor

---

[5] P.O. Gabonia's Report (Def. Ex. D) was not admitted into evidence because the Court sustained the Government's hearsay objection. ECF No. 59 at 80:19–21. However, P.O. Stark later discussed the contents of the report on the record absent objection from the Government. *See id.* at 92:9–93:6.

female, about 12 to 15 years old, who was nude and had her "legs spread open in a lewd and lascivious manner." *Id.* at 64:1–6. P.O. Stark's Petition does not mention these images. *Id.* at 90:3–10; Def. Ex. C.

P.O. Gabonia prepared a summary of what took place during the search. ECF No. 59 at 65:11. About a week after the search, P.O. Stark also emailed a summary to the FBI that detailed the events leading up to finding CSAM on Shove's phone. *Id.* at 66:15–67:7. The FBI, in turn, used that information to secure a search warrant for the phone. *Id.* at 67:10–13.

### D. Reliability of Polygraph Examination

The parties each called expert witnesses to discuss the results of Shove's polygraph examination, with Shove first calling Dr. Charles Hontes. ECF No. 59 at 124:12. Dr. Hontes was trained as a polygraph examiner and practiced for many years before transitioning to research roles at universities, where he continues to practice as an examiner and provide trainings. *Id.* at 125:18–23, 126:16–128:17. Rick Jordan, the examiner who performed Shove's polygraph test, testified for the Government. *Id.* at 181:1. Mr. Jordan is a polygraph examiner of 26 years who has completed an estimated hundreds of hours of training and currently works as a private examiner on contract with the U.S. Probation Office. *Id.* at 181:23–184:19. The Court admitted both Dr. Hontes and Mr. Jordan to testify as experts. *Id.* at 133:10–12, 192:4–5.

Dr. Hontes explained that it is important for polygraph examinations to have both relevant questions and comparison questions to determine which type of question produces a bigger response from an examinee. *Id.* at 136:24–137:1. He noted that without proper comparison questions, an examiner cannot accurately score relevant questions. *Id.* at 137:17–138:4. In other words, relevant questions cannot simply be evaluated on their own. *Id.* When evaluating Shove's polygraph test, Dr. Hontes took issue with the way Mr. Jordan administered the comparison questions, which Dr. Hontes claims were underemphasized. *Id.* at 154:22–160:12. According to Dr. Hontes, underemphasizing the comparison questions made the test less reliable. *Id.* at 158:13–159:3.

Dr. Hontes independently scored the results of Shove's test but found them difficult to evaluate because the charts were compressed and only in black and white, not color. *Id.* at

151:24–152:23. Despite these difficulties, Dr. Hontes was able to form an opinion on the outcome of Shove's polygraph and opined that he was "clearly truthful" in his answers to all the relevant questions. *Id.* at 160:15–161:1. The Government challenged this conclusion on cross, noting that Dr. Hontes found Shove "truthful" on all the questions, but later events proved him to be untruthful. *Id.* at 161:10-165:21. The Government pointed out that Shove denied viewing pornography, having an undisclosed device, and having unauthorized contact with a minor at his exam (which Dr. Hontes all scored as "truthful") yet later admitted to having an undisclosed cell phone that contained CSAM and having sexual contact with a 15-year-old boy. *Id.*

The Government also challenged Dr. Hontes's characterization of Mr. Jordan's conclusions. It asserted that Mr. Jordan's finding that Shove had a "significant reaction" to a relevant question did not mean that he found Shove deceptive because a significant reaction could be caused by other factors aside from lying. *Id.* at 168:9–22. While Dr. Hontes agreed that a significant reaction could be caused by circumstances other than deception, he pushed back regarding Mr. Jordan's conclusion, asserting that a finding of "significant reaction" was equivalent to a finding of "deception." *Id.* at 168:20–23.

Mr. Jordan testified on direct examination that he does not use the term "deceptive" in his scoring of polygraph tests because a significant reaction does not necessarily mean that an examinee is lying. *Id.* at 194:12–16. He explained that for Shove's examination, he did not emphasize the comparison questions much because in the past, he found that examinees were able to recognize which questions were important and adjust their reactions accordingly. *Id.* at 195:7–196:21. Mr. Jordan also noted that he only scored the first part of the test because Shove appeared to be sleeping for the remainder of the questions. *Id.* at 196:2–13.

On cross, Shove challenged the narrative portion of Mr. Jordan's report because the language he used seemed to indicate that Shove withheld certain information, whereas a direct examination of the polygraph transcript suggested that Shove volunteered the information based on the order the questions were asked. *Id.* at 201:12–207:17. Mr. Jordan agreed that Shove volunteered the information. *Id.* at 203:17–20. Shove also disputed the exam's practice questions because he did not actually lie when Mr. Jordan directed him to, which Shove claimed

demonstrated that Mr. Jordan was unable to gauge an accurate reaction to the relevant questions. *Id.* at 211:2–213:21.

Ultimately, the Court declines to assign particular weight to either expert's testimony because the reliability of Shove's polygraph examination is irrelevant to the Court's reasonableness determination. As discussed further below, assuming that the polygraph was unreliable—or simply disregarding the polygraph results altogether—does not change the outcome of the Court's decision.

### III.     BRIEF SUMMARY OF THE PARTIES' ARGUMENTS[6]

Shove argues that the search of his cell phone was unreasonable under the Fourth Amendment because his privacy interests outweigh any related government interests. ECF No. 20 at 6–9. He asserts that although his reasonable expectation of privacy is reduced because he is on supervised release, his privacy interest is "still significant." *Id.* at 6. According to Shove, his expectation of privacy should be equal to that of a probationer, because both probationers and supervisees are overseen by the U.S. Probation Office, which imposes the same special conditions of supervision—namely, the search condition at issue here. *Id.*

But the Government contends that Shove's expectation of privacy as a supervisee is lower than a probationer's and more akin to a parolee's. ECF No. 31 at 10–11. It asserts that supervisees should be treated like parolees because both serve a term of incarceration, whereas probation is served "in lieu" of incarceration. *Id.* Thus, the Government argues, the related government interests in supervising more serious offenders (like parolees and supervisees) are greater than they are for probationers. *Id.*

Shove counters this argument by highlighting the fact that unlike parole, supervised release does not provide a person early release from prison in exchange for supervision, but rather it imposes an additional period of supervision after the full prison term has already been served. ECF No. 38 at 2.

---

[6] Because the parties are familiar with the arguments, the Court only summarizes the arguments relevant to this Recommendation.

In terms of the clarity of Shove's search condition, he argues that "person," "property," "residence," or "automobile" do not clearly or unambiguously encompass his cell phone. ECF No. 20 at 5. He also contends that given the nature of a cell phone, his privacy interest is "substantial." *Id.* at 7. The Government, however, asserts that Shove's search condition—when read in conjunction with the other special conditions of his supervised release—clearly encompasses his cell phone. ECF No. 31 at 11–13. It then reasons that Shove's privacy interest in his cell phone is weakened due to both his status as a supervisee and the clarity of his search condition. *Id.* at 14–15.

Finally, as to related government interests, Shove contends that the interests are weak because the officers did not have strong reasons to suspect that he violated his conditions. ECF No. 20 at 8–9. He argues that the polygraph exam was unreliable and that even if P.O. Stark relied on its results, he only knew that Shove had an undisclosed phone, not that the phone contained CSAM. *Id.* But the Government contests the strength of its interests, arguing that they were particularly strong considering the weight of the evidence against Shove. ECF No. 31 at 18–19. It asserts that the polygraph was sufficiently reliable and that regardless of its reliability, P.O. Stark was permitted to rely on it for purposes of invoking the search condition. *Id.* The Government then points to Shove's admissions that (1) he had an undisclosed cell phone, and (2) the phone contained CSAM, which the Government contends he made *before* the cell phone search. *Id.*

At bottom, the parties disagree regarding the strength of their respective interests and the outcome of the balancing test. Shove argues that his weighty privacy interests—when compared to the Government's weak interests—are substantial enough to protect him from the warrantless cell phone search. ECF No. 20 at 6–9. But the Government maintains that once the balancing test is performed, the heavy government interests outweigh Shove's diminished privacy interests, making the search reasonable under the Fourth Amendment. ECF No. 31 at 9–19.

**IV. ANALYSIS**

A supervisee's acceptance of a search term in his conditions of supervision does not alone render an otherwise unconstitutional search lawful. *See United States v. Lara*, 815 F.3d 605, 609

(9th Cir. 2016); *United States v. Johnson*, 875 F.3d 1265, 1274 (9th Cir. 2017). Rather, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Determining the reasonableness of a search requires balancing "on the one hand, the degree to which the search intrudes upon an individual's privacy and, on the other, the degree to which the search is needed for the promotion of legitimate governmental interests." *Lara*, 815 F.3d at 610 (internal quotations and citations omitted).

The Court first examines the strength of Shove's privacy interests using the guideposts set forth by the Ninth Circuit. It then assesses the strength of the Government's interests based on that same guidance. Finally, the Court balances the weight of the respective interests to determine whether the search of Shove's cell phone was reasonable under the Fourth Amendment.

### A. Shove's Privacy Interests

Determining the strength of Shove's privacy interests "depends on several factors, the most important of which are his status as a [supervisee], the clarity of the conditions of [supervised release], and the nature of the contents of a cell phone." *Id.*; *see also Johnson*, 875 F.3d at 1273–75 (considering same factors for parolee). The Court discusses the impact of each factor on Shove's privacy interests below.

#### 1. Status and Offense

The crux of the parties' arguments centers around Shove's status as a person on federal supervised release. Shove asks the Court to find that a supervisee's expectation of privacy is akin to a probationer's and apply the framework the Ninth Circuit set forth in *Lara*. The government argues that the Court should instead hold that a supervisee's expectation of privacy is equal to a parolee's and follow the standards the Ninth Circuit outlined in *Johnson*. Though existing Ninth Circuit precedent provides significant insights, it is not entirely conclusive on this issue.

In *Lara*, the Ninth Circuit found a cell phone search pursuant to a probationer's search condition unreasonable under the Fourth Amendment. 815 F.3d at 612. Though the court acknowledged that the defendant's expectation of privacy was "significantly diminished" due to his status as a probationer, it found that his privacy interest was "still substantial." *Id.* at 610. The

nature of a cell phone's contents and the fact that his search condition did not clearly and unambiguously encompass his cell phone also strengthened his privacy interests. *Id.* at 610–11. When balanced against the government interests—which were relatively weak because officers had no reason to suspect a violation—his privacy interests were "sufficiently substantial" to protect him from the cell phone search. *Id.* at 612.

Just a year later, in *Johnson*, the Ninth Circuit upheld a cell phone search executed under a parolee's search condition, in large part due to his status as a parolee. 875 F.3d at 1275–76. The court found *Lara* inapplicable because "parolees have reduced privacy interests compared to probationers." *Id.* at 1275 (citations omitted). Although the court recognized that parolees still enjoy limited Fourth Amendment rights and that privacy interests in a cell phone are "weighty," the "substantial" government interests in supervising parolees along with the broader language of the search condition outweighed the defendant's privacy interests, making the search reasonable. *Id.*

That same year, the Ninth Circuit was tasked with deciding the level of Fourth Amendment protections afforded to a person on California mandatory supervision, which is neither probation nor parole. *United States v. Cervantes*, 859 F.3d 1175, 1181 (9th Cir. 2017). Rather than creating a third category, the court determined that California's mandatory supervision was more akin to parole. *Id.* at 1180. In reaching its decision, the court recognized that a defendant subject to mandatory supervision is sentenced to a term of imprisonment in jail; that the concluding portion of the sentence is served at liberty on mandatory supervision, subject to conditions; and that if the defendant violates the conditions, they may be returned to jail for the remainder of the original sentence. *Id.* at 1180–81. Thus, the court found that mandatory supervision—like parole—involves "release from prison, before the completion of a sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id.* at 1180 (citation omitted).

A decade earlier, the Ninth Circuit declined to recognize a distinction between supervised release and parole, but—importantly—not in the context of determining the extent of a supervisee's expectation of privacy. *United States v. Betts*, 511 F.3d 872, 876 (9th Cir. 2007). In

*Betts*, a defendant on supervised release challenged certain conditions of his release, arguing that they were more restrictive than necessary to serve the goals of his supervision. *Id.* at 874. The court upheld a standard search condition because the Supreme Court had previously upheld a similarly worded condition that was imposed on California parolees. *Id.* at 876 (citing *Samson v. California*, 547 U.S. 843 (2006)). The Ninth Circuit found that because the "blanket requirement" imposed on parolees was constitutional, it was not an abuse of discretion for a judge to impose a similar condition on supervisees. *Id.* Given that supervised release replaced parole in the federal system, the court found "no sound reason for distinguishing parole from supervised release *with respect to this condition*." *Id.* (emphasis added).

Though *Betts* may suggest that courts should treat supervised release and parole in the same manner, it did not discuss the pertinent differences between parole, supervised release, and probation. In addition, *Betts* did not explain how such differences placed supervisees in the same camp as parolees for Fourth Amendment purposes like the court did in *Lara*, *Johnson*, and *Cervantes*. Instead, it simply stated that because supervised release replaced parole, a standard condition of release that was constitutional for parolees remained constitutional for supervisees. *Id.* But the analogy between supervised release and parole is not perfect, and some of the logic and rationale underlying courts' parole decisions—particularly in the Fourth Amendment context—may not be particularly applicable to supervised release.

As already mentioned, for Fourth Amendment expectation of privacy purposes, the Ninth Circuit declined to recognize a third category of privacy interests for California mandatory supervisees despite acknowledging that it fell between probation and parole "on the continuum of punishments." *Cervantes*, 859 F.3d at 1180–81. It is possible that the court would also refuse to do so in a case like this one. But the mandatory supervision in *Cervantes* is much closer to parole than supervised release is to parole. So that ruling is not necessarily determinative here, especially given the court's acknowledgment that the "distinction could prove important under our circuit's case law." *Id.* at 1180.

In deciding whether supervised release is more akin to probation or parole, "the issue is admittedly a close one." *Cf. id.* On the one hand, like parolees, supervisees typically have been

convicted of more serious offenses—or are at least considered more serious offenders—as they are sentenced to a period of incarceration. This seems to put them more in line with parolees.

But on the other hand, supervisees are not released from prison early *in exchange* for being on supervision, like parolees or those on California's mandatory supervision. When a parolee (or mandatory supervisee) violates their conditions of release, they return to prison for the *remainder* of their sentence. But a federal supervisee serves the entirety of their prison sentence and receives a period of supervision *in addition* to the sentence they already served. When a supervisee violates, they can serve yet another term of imprisonment, even if they have already completed the maximum sentence for their conviction. While probationers too can be sentenced to imprisonment upon violation of their conditions, like parole, a probationer would only face imprisonment up to the maximum sentence for their underlying conviction.

Each of these considerations weighed heavily in the Supreme Court's decision in *Samson*, which held that along the "continuum," parolees have a diminished expectation of privacy compared to probationers. 547 U.S. at 850. There, the Court focused on parole being "more akin to imprisonment than probation is to imprisonment" because probation is granted "in lieu" of incarceration, typically due to the less serious nature of the offenses. *Id.* But the Court also based a significant portion of its rationale on the fact that parolees give up certain liberties *in exchange* for early release from prison, thereby giving the government a heightened interest in ensuring compliance:

> The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence. In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements.

*Id.* (internal quotations and citations omitted).

Given the *additional* penalties (oftentimes, incarceration) that supervisees may face *after* completing their prison sentence, heightened constitutional protections may be warranted. And the Supreme Court—albeit in a narrow circumstance—has recently begun to recognize differences between parole and supervised release along with the implications of such differences. *See, e.g.*, *United States v. Haymond*, 588 U.S. 634, 652 (2019) ("But unlike parole, supervised

release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation *after* the completion of his prison term. . . In this case, that structural difference bears constitutional consequences.") (internal quotations and citations omitted).

Despite the existing ambiguities within Ninth Circuit law, Shove cannot establish that the search of his cell phone was unreasonable even if the Court treats him as a probationer. There are several factors in this case which suggest that Shove's expectation of privacy would be weighed differently than in *Lara*. For example, in *Lara*, the Ninth Circuit distinguished the defendant, a nonviolent drug offender, from a probationer convicted of willfully inflicting a corporal injury on a cohabitant and found that Lara's expectation of privacy was greater "because he was not convicted of a particularly 'serious or intimate' offense." *Lara*, 815 F.3d at 610 (citing *United States v. King*, 736 F.3d 805, 809 (9th Cir. 2013)). Here, Shove's offense is more serious and intimate than a nonviolent drug offense. This, and other factors discussed below, significantly distinguish his case from *Lara*.

### 2. Clarity of Conditions

A defendant's reasonable expectation of privacy is "significantly diminished" when his conditions of supervision "clearly expressed the search condition" of which the defendant "was unambiguously informed." *Lara*, 815 F.3d at 610 (citing *United States v. Knights*, 534 U.S. 112, 119–20 (2001)). In *Lara*, the defendant agreed to "submit [his] person and property, including any residence, premises, container, or vehicle under [his] control to search and seizure." *Id.* The Ninth Circuit found that none of the terms in the search condition—in particular, neither "container" nor "property"—clearly or unambiguously encompassed his cell phone given the amount and character of data accessed by a cell phone search. *Id.*

Shove argues that his search condition is similarly unclear because "cell phone" was not among the "enumerated" categories subject to a warrantless search. His search condition reads:

> Search and Seizure – You shall submit to the search of your person, property, residence, or automobile under your control by the probation officer or any other authorized person under the immediate and personal supervision of the probation officer, without a search warrant ***to ensure compliance with all conditions of release***.

Def. Ex. B at 5 (emphasis added).

But while Shove's search condition has similar descriptive categories as the search clause in *Lara*, his condition affords probation officers additional force in ensuring compliance with his conditions—three of which are pertinent to his cell phone. Special Condition No. 1 prohibits Shove from having direct contact with minors, including through "written communication." *Id.* Special Condition No. 3 forbids him from viewing or possessing pornography, "including any photograph, film, video, picture, computer, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means." *Id.* And Special Condition No. 6 requires Shove to allow probations offers to conduct periodic, unannounced searches of his electronic devices to ensure compliance with his computer monitoring condition, albeit subject to limited purposes. *Id.*

When read in conjunction with the search condition, Special Condition Nos. 1, 3, and (to a lesser extent) 6 make clear that Shove's cell phone is subject to a warrantless search. Unlike the defendant in *Lara*, whose search condition contained no such provision, Shove's probation officers were authorized to perform searches to ensure compliance with his conditions. Written communications with minors would obviously include texts and other forms of instant messaging. Pornography could be readily viewed or stored on a cell phone. And though not necessarily applicable to this particular search, Special Condition No. 6 made Shove aware that his electronic devices were being monitored for violations and that they could be searched by his probation officers periodically and unannounced. His Computer Monitoring Agreement also informed him that any information gathered by monitoring software could be used against him. The clarity of these conditions "significantly diminished" Shove's expectation of privacy. *Lara*, 815 F.3d at 610. Thus, on this ground too, Shove's case is distinguishable from *Lara*.

### 3. *Nature of a Cell Phone*

Shove's privacy interest is "substantial" due to "the broad amount of data contained in, or accessible through, his cell phone." *Id.* at 611–12. As the Supreme Court recognized in *Riley*, unlike other types of searches, a cell phone search can "typically expose. . . far *more* than the most exhaustive search of a house," because modern phones contain "[t]he sum of an individual's private life." 573 U.S. at 394, 396. These unique features, along with "the corresponding

intrusiveness of a cell phone search," led the Ninth Circuit to conclude that privacy interests in cell phones are weighty. *Lara*, 815 F.3d at 611; *Johnson*, 875 F.3d at 1274.

However, despite this weighty interest, even *Lara* itself recognized that the defendant's privacy interest in his cell phone was "somewhat diminished" due to his status as a probationer. 815 F.3d at 612. And given Shove's more serious offense and clearer search condition, his privacy interests are considerably weaker than the defendant in *Lara*.

### B. The Government's Interests

The Government has "at least two related government interests" in conducting warrantless searches of supervisees: combating recidivism and facilitating reintegration. *See Lara*, 815 F.3d at 612.[7] The strength of the Government's interests varies depending on the degree to which the Government "has a specific reason to suspect" that a defendant is "reoffending or otherwise jeopardizing his reintegration into the community." *Id.* In *Lara*, the Ninth Circuit recognized that the defendant "merely miss[ing] a meeting with his probation officer" was "worlds away from the suspected crimes that prompted the searches in *King* and *Knights*." *Id.* And emphasizing the ubiquity of cell phones, the court was unpersuaded by the officer's suggestion, with nothing more, that the defendant could use his phone to arrange drug sales. *Id.*

As the *Lara* court recognized, the officers in *Knights* had substantial evidence that the defendant committed vandalism and arson while on probation before exercising the search condition at his home. *Id.* (citing 534 U.S. at 114). The officers in *King* too had reason to suspect that the defendant had reoffended—by being involved in a homicide—and knew that he had been previously convicted of a violent crime. *Id.* (citing 736 F.3d at 806). The Ninth Circuit found these cases distinguishable, and the government interests weaker, because missing a meeting was not indicative of committing a violation, let alone one that involved the defendant's phone. *Id.*

---

[7] The Court recognizes that if it were to place Shove in the category of parolees, the baseline government interests would be stronger than in *Lara* and would include the additional interest of "effectively detecting [supervised release] violations." *See Johnson*, 875 F.3d at 1274. But as discussed above, because Shove fails even under his chosen *Lara* framework, the Court need not decide whether supervised release is closer to probation or parole and only discusses the *Lara* considerations.

Yet, Shove's circumstances here place him more squarely in the camp of *King* and *Knights* than *Lara*. After Shove called in sick to a polygraph test, P.O. Stark went to his apartment for a home visit, where Shove admitted that he lied about his reason for missing the test: he was not sick, but simply nervous about how he would do when asked about his contact with minors. At his rescheduled polygraph, Shove had a significant reaction to the examiner's question about an undisclosed device.[8] Based on this result—along with the prior missed test and accompanying admission—P.O. Stark prepared a search plan and assembled a search team. Once P.O. Stark located Shove and informed him that the officers were exercising the search condition, Shove admitted to both having an undisclosed phone and possessing CSAM on the phone, all before the search of the cell phone took place.

These facts gave officers specific reasons to suspect that Shove violated his conditions, and that evidence of these violations would be found on his phone. The Government's interests, therefore, are weightier here than they were in *Lara*.

\* \* \*

On balance, the Court finds that the search of Shove's cell phone was reasonable under the Fourth Amendment. Even by placing Shove in the same category as probationers—which the Court does solely for the sake of argument—Shove does not prevail under his chosen *Lara* framework. Shove's expectation of privacy is diminished compared to the defendant in *Lara* given his more serious and intimate offense. The clarity of his search condition, when read in conjunction with his other special conditions, also diminishes his privacy interests. And the

---

[8] The Court declines to assign any particular weight to the parties' polygraph experts or to determine the reliability of the polygraph administered. Even assuming that the polygraph was unreliable, the Court is not aware of any legal tenet suggesting that P.O. Stark was not permitted to rely on the polygraph results for the purpose of generating a separate investigation. In this vein, their own guidance suggests that they can. Admin. Off. of the U.S. Courts, *Overview of Probation and Supervised Release Conditions* (July 2024), https://www.uscourts.gov/sites/default/files/overview_of_probation_and_supervised_release_conditions_0.pdf ("Under approved judiciary procedures, polygraph results may be used to increase the level of supervision, modify treatment plans, or generate a separate investigation."). Moreover, even if the Court disregards the polygraph results altogether, the officers still had significant reasons—namely, Shove's admissions—to suspect that he violated his conditions.

Government's interests here are heightened because officers had specific reasons to suspect that Shove violated his conditions, and that his phone contained evidence of such violations.

While privacy interests in a cell phone are significant, the Government's heightened interests here are sufficient to overcome Shove's diminished expectation of privacy. Because the Court finds the search reasonable, it need not reach the parties' remaining arguments. As such, the Court recommends that Shove's Motion be denied.

## V. CONCLUSION

**IT IS THEREFORE RECOMMENDED** that Shove's Motion to Suppress (ECF No. 20) be **DENIED**.

**IT IS FURTHER ORDERED** that objections are due by **November 13, 2024**, and responses to objections are due by **November 20, 2024**.

## NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: November 6, 2024

BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE